

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

September 23, 2020

**BY ECF**
Honorable Alison J. Nathan
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *Documented NY v. United States Department of State, et al.*,
            20 Civ. 1946 (AJN)

Dear Judge Nathan:

      I write respectfully on behalf of the United States Department of State ("State") as directed by the Court's September 18, 2020 Order, ECF No. 29, in opposition to plaintiff's renewed motion to expedite State's processing of its FOIA request. Plaintiff's letter also raises several other issues, which we address below.

      **Processing rate.** As explained in the accompanying declaration of Eric F. Stein, Director of State's Office of Information Programs and Services ("IPS"), State has proposed that it be required to process 200 pages per month, taken from records that have already undergone an initial responsiveness review. This is the maximum feasible rate to which the agency can commit given its resources, the constraints of both other requests, and the current pandemic. By contrast, plaintiff offers no factual support demonstrating that its proposal—that State either process 1500 pages per month, or produce 1000 pages per month—is "practicable." State respectfully requests that the Court adhere to State's proposal of 200 pages per month of processing, which State has committed to revisit within 45 days of the agency's transition to the next phase of reopening. Stein Decl. ¶ 18.

      *The law.* As the government's prior brief noted, FOIA imposes no specific timetable or rate for processing requests. Govt. Opp'n, ECF No. 22, at 3-5.[1] Even in cases of expedited processing, the standard is "as soon as practicable," 5 U.S.C. § 552(a)(6)(E)(iii), a standard that incorporates factors such as how many expedited FOIA requests the agency is already processing, the volume of requested materials, the demands of agency review, and competing obligations of the same agency staffers. *See* Govt. Opp'n 6-7 (citing cases).

---

[1] Although some of the facts about State's response to the pandemic have been updated, as reflected in the Stein Declaration, the government's presentation of the law and its position in its prior brief is accurate and largely applicable to the instant renewed motion. In the interests of brevity, we have tried to avoid simply repeating those arguments.

As State previously noted, it is not clear this request meets the expedited processing standard. Enforcement of the presidential proclamation to which the request relates is and has been enjoined—the proclamation never went into effect. *See* Govt. Opp'n 9-10. There is therefore no "urgency," 5 § 552(a)(6)(E)(v)(II), to inform the public about interpretive guidance or other matters sought in the request.

*State's proposal.* However, assuming for the sake of argument that the request does qualify for expedited processing, plaintiff's renewed opposition does not engage with the legal standard for expedited processing, and in any event, plaintiff's proposed rate is not "practicable."

As State's previous declaration explained, the agency's FOIA processing operation was upended by the pandemic, resulting in an initial estimated 96% reduction in processing capacity. Weetman Decl. ¶ 24. The agency has taken steps to move a large part of its processing operations to remote work. Weetman Decl. ¶¶ 26-29. As the agency has partly reopened, some FOIA processing staff have now returned to in-person work as well. Stein Decl. ¶¶ 4-6. But disruptions remain. First, while the agency has made significant progress to restore processing capacity, not all staff have been able to resume work, and those who have still encounter technical difficulties or other disturbances that slow processing. Stein Decl. ¶ 6. Second, State must consult within the agency or with other agencies before it can fully process certain records, and this consultation process has been slowed. Stein Decl. ¶ 9. Other agencies have their own disruptions to ordinary work, and they may not be prioritizing FOIA compared to essential operations. Stein Decl. ¶ 9.

Moreover, as Ms. Weetman's declaration also explained, apart from the pandemic, State's FOIA program is "extremely burdened." Weetman Decl. ¶ 34. State's FOIA docket has increased in the last decade. Weetman Decl. ¶ 34. The agency currently has more than 190 FOIA and Privacy Act litigation cases, Stein Decl. ¶ 16, and as noted in the exhibit to the status report, it currently has dozens of cases with monthly productions, *see* ECF No. 27-1. The agency's efforts to clear its backlog in the past few years were initially successful, but have been impeded in part by litigation cases that, prior to the pandemic, had extraordinarily high mandated processing rates. Weetman Decl. ¶¶ 35-45.

In light of these circumstances, State has determined that a rate of processing 200 pages per month of records that have undergone an initial responsiveness review is the greatest practicable rate it can offer at this time. Processing at a greater rate—such as plaintiff's proposal to either produce 1000 pages or process 1500 pages each month—is not "practicable" because it would "require the Department to redirect its finite and already thinly stretched resources at the expense of other FOIA cases, most of which were filed before this one." Stein Decl. ¶ 16. Specifically, "IPS would have to reassign several reviewers from the cases to which they are currently assigned to this case, which would halt or dramatically reduce the Department's ability to process those other cases." Stein Decl. ¶ 16. Mr. Stein further explains that plaintiff's proposal "would also jeopardize the Department's ability to comply with court orders in its other FOIA litigation cases." Stein Decl. ¶ 16. Finally, "[m]anaging compliance with such an order would further divert resources from IPS' continuing efforts to adapt its FOIA program to the pandemic, which include working to resume processing in cases that have been completely stayed or paused since March." Stein Decl. ¶ 16. Thus, "there would be no way to comply with such an order in

this case without causing significant and long-lasting delays to the Department's processing of other, first-in-time requests." Stein Decl. ¶ 16.

As the government noted in its previous brief, *see* Govt. Opp'n 15, recent experience with large processing mandates shows the lasting disruption that a single case's processing order can have on the agency's FOIA operations as a whole. When State was ordered to process thousands of pages per month of former Secretary Clinton's emails, the agency experienced "not only major delays in all FOIA case processing, but an enduring backlog in FOIA processing, staff burnout, and departures that further undermined the Department's ability to meet its FOIA processing obligations." Weetman Decl. ¶ 42. Similarly, the *Open Society* processing order requiring 5000 pages of processing per month has led to an increase in State's backlog of FOIA requests for the first time in several years. Weetman Decl. ¶ 44. Thus, State reasonably expects enduring negative consequences for other requests if plaintiff's proposed rate were adopted.[2]

*Plaintiff's arguments.* Plaintiff has not disputed, or even seriously questioned, State's factual presentation about what is "practicable." Plaintiff's arguments are thus largely beside the point, but meritless in any event.

First, while State regrets that it was unable to provide a more firm estimate of the total number of potentially responsive pages in its September 11 status report, this was due principally to State's continuing efforts to ensure it has gathered all potentially responsive pages, not a failure of diligence. As the status report explained, State initially proposed that no search be done for records created after November 3, 2019. It was only after discussions in August with plaintiff to avoid dispute about State's search that the agency determined to run this second search. Stein Decl. ¶ 13 & n.5. Given the design of State's software for processing records, a page count is generally not immediately available after records are gathered. Instead, those records undergo an initial responsiveness review first, and the remainder are loaded into a system that can provide a page count. Stein Decl. ¶ 14.[3]

---

[2] As the government also previously noted, even for requests entitled to expedited processing, a single FOIA requester should not be permitted to monopolize the limited resources each agency has available for the benefit of the public as a whole. *See Nat'l Sec. Counselors v. United States Dep't of Justice*, 848 F.3d 467, 471 (D.C. Cir. 2017) (approving FBI policy of processing individual FOIA requests in 500-page increments because this "provides more pages to more requesters, avoiding situations in which a few, large queue requests monopolize finite processing resources" (quotation marks omitted)).

[3] To recap, for completeness, State's searches overall gathered more than 9000 files. Of those, approximately 2000 files were returned by the initial email search, and that figure has been reduced to 137 documents remaining to be processed after preliminary responsiveness review, consisting of approximately 1200 pages. Stein Decl. ¶ 13 & nn.5-6. The remaining approximately 7000 files—including approximately 5000 email files located through the supplemental email search for records created after November 3, 2019—are still undergoing preliminary responsiveness review, and no page count is yet available. Stein Decl. ¶ 13 & n.5.

Second, the page count and redaction prevalence in State's first production are irrelevant to a processing rate order. Although 11 pages were *produced* in the first production, State has *processed* far more: between State's initial responsiveness review and a subsequent responsiveness and deduplication review, State has, since July, narrowed the first set of emails from a universe of approximately 2000 emails to a universe of 137 documents. Stein Decl. ¶ 13. As explained in the status report and Ms. Weetman's declaration, this review takes significant time. And it is still "processing" necessary for State to completely review every potentially responsive page it has gathered. As the status report made clear, State's proposal to process 200 pages per month assumes that those pages will have first undergone a responsiveness review; thus, in future months, productions would likely be closer to 200 pages (unless pages are deemed nonresponsive after additional review, determined to be duplicates of documents previously processed, or withheld in full).

The fact that the agency's first production includes significant redactions is irrelevant to the question of processing rates. Plaintiff's request facially seeks intra- and inter-agency communications that plaintiff must have known were likely subject to the deliberative process privilege, which is protected by FOIA's fifth exemption.[4] *See* 5 U.S.C. § 552(b)(5). Indeed, the request makes no effort to carve out deliberative communications, attorney-client communications, or attorney work product, for example. In any event, the fact of these redactions simply has no bearing on the question of what is "practicable," and if plaintiff disputes any exemptions, it will have an opportunity to raise this with the Court once all processing is complete.

Finally, there is no merit to plaintiff's suggestion that State is "us[ing] the pandemic to excuse withholding documents and obscuring government activity." Pl. Ltr. 1. As Ms. Weetman's declaration explained in detail, the pandemic caused significant disruption to State's FOIA processing capabilities (initially, an estimated 96% reduction in processing capability, *see* Weetman Decl. ¶ 24), but State has taken steps to address those disruptions and increase its processing, *see id*. ¶¶ 26-33. Indeed, State is currently seeking to hire new staff and contractors for FOIA operations. Stein Decl. ¶ 6. The proposal to process 200 pages per month represents two-thirds of the pre-pandemic standard processing rate to which State could generally commit. Nothing in plaintiff's bare accusation of impropriety overcomes the presumption of good faith to which the government's declarations are entitled. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

**Rolling Vaughn index.** Plaintiff's request that State be directed to produce a Vaughn index for each production should be denied because it is not required by law, would be inefficient, and would unnecessarily sap resources State already needs for processing this and other requests.

---

[4] For example, the request seeks "all emails, communications and analyses related to the Proclamation and the comment process" sent by State to OMB, and "any other emails, communications, and analyses related to the Proclamation and the comment process, between or among DOS and/or (a) any part of the Executive Branch." Complaint, ECF No. 6-1 at 3.

FOIA itself does not require the government to create a Vaughn index. Instead, the Vaughn index is a tool courts use for assessing whether an agency has met its burden at summary judgment. There is no uniform requirement for how an index must look, what information it must contain, or whether one need be filed at all. *See Am. Civil Liberties Union*, 710 F.3d at 432-33; *Halpern v. F.B.I.*, 181 F.3d 279, 291 (2d Cir. 1999) ("[A] number of courts, including our own, have eschewed rigid adherence to any particular indexing format under the *Vaughn* standard, opting instead for a functional approach.").[5]

From a practical perspective, creating a Vaughn index for each production would consume resources that could otherwise be used for processing. Stein Decl. ¶ 17. Here, as is typical, the agency labeled its withholdings with the exemption applied, and left non-exempt portions unredacted. *See generally* ECF No. 28-1 (first production). Creating a Vaughn index to cover every redaction would be inefficient: Many redactions are self-evident; others will come in documents that may be of no interest to plaintiff. If plaintiff wishes for more information about the basis for specific redactions of interest, the undersigned and the agency are available to answer reasonable questions on an informal basis in the interest of avoiding litigation. *See* Stein Decl. ¶ 17. This practice—typical for sophisticated FOIA litigation—avoids unnecessary effort for both sides and helps narrow any dispute for potential summary judgment briefing on exemptions.

**Other agencies.** Plaintiff's letter also mentions HHS and OMB. Plaintiff broadly claims that these agencies "have likewise failed to produce a reasonable number of documents," but to be clear, both agencies have complied with the processing schedules agreed to with plaintiff. Likewise, that productions contain redactions should be unsurprising given the request and does not indicate any impropriety. The government has continued to provide information to plaintiff about both agencies on an informal basis in an attempt to avoid litigation, and would prefer to continue to discuss these matters directly with plaintiff. Because the agencies are in compliance with the parties' agreement, there is no issue with either agency currently ripe for the Court's intervention.

---

[5] For this reason, courts have often rejected requests to require a Vaughn index prior to the government's summary judgment motion. *See, e.g.*, *Grey v. Cuccineli*, No. 9:18-CV-01764-DCN, 2020 WL 362932, at *2 (D.S.C. Jan. 22, 2020) (surveying examples, and declining to compel a Vaughn index prior to summary judgment); *Mullen v. U.S. Army Criminal Investigation Command*, No. 1:10CV262 JCC/TCB, 2011 WL 5870550, at *5 (E.D. Va. Nov. 22, 2011) (similar). While we disagree with the view, the government is aware that courts have directed agencies to provide a Vaughn index prior to summary judgment. *See, e.g.*, *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. United States Dep't of State*, 300 F. Supp. 3d 540, 550 (S.D.N.Y. 2018). Requiring a separate Vaughn index for each production, however, goes a step beyond what even the *Brennan Center* court ordered—in that case, which apparently involved six specific, already-identified documents, *id*. at 542, the court ordered processing of all documents and creation of a Vaughn index by a single date, *id*. at 551.

Honorable Alison J. Nathan  Page 6
September 23, 2020

We thank the Court for its attention to this matter.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: */s/ Peter Aronoff*
PETER ARONOFF
Assistant United States Attorney
Telephone: (212) 637-2697
Facsimile: (212) 637-2717
E-mail: peter.aronoff@usdoj.gov

*Counsel for the government*