THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DOCUMENTED,

        *Plaintiff*,

v.

        Case No. 20-cv-1946

DEPARTMENT OF STATE, *et al.*

        *Defendants*.

## DECLARATION OF ERIC F. STEIN

Pursuant to 28 U.S.C. § 1746, I, Eric F. Stein, declare and state as follows:

1. I am the Director of the Office of Information Programs and Services ("IPS") of the United States Department of State (the "Department" or "State") and have served in this capacity since January 22, 2017. Previously, I served as the Acting Director since October 16, 2016, and as the Acting Co-Director since March 21, 2016. I am the State official immediately responsible for responding to requests for records under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, the Privacy Act of 1974, 5 U.S.C. § 552a, and other records access provisions. As the Director of IPS, I have original classification authority and am authorized to classify and declassify national security information. Prior to serving in my current capacity, I worked directly for State's Deputy Assistant Secretary ("DAS") for Global Information Services ("GIS") and served as a senior advisor and deputy to the DAS on all issues related to GIS offices and programs, which include IPS.

2. The core responsibilities of IPS include: (1) responding to records access requests made by the public (including under the FOIA, the Privacy Act, and the mandatory declassification review requirements of the Executive Order governing classified national security information), by members of Congress, and by other government agencies, and those made pursuant to judicial process such as subpoenas, court orders, and discovery requests; (2) records management; (3) privacy protection; (4) national security classification management and declassification review; (5) corporate records archive management; (6) research; (7) operation and management of the Department's library; and (8) technology applications that support these activities.

3. The purpose of this declaration is to respond to Plaintiff's proposed processing schedule in this case by updating the Declaration of Susan C. Weetman, which the Department filed in this case on July 22, 2020. Among other topics, the Weetman Declaration covered in detail the Department's standard procedures for processing FOIA requests, the effects of the pandemic on the Department's operations, and the Department's FOIA burden. The purpose of this declaration is to update the Weetman Declaration by explaining the steps IPS has taken to address the pandemic since that declaration was filed and to justify the Department's position that it can process 200 potentially responsive pages per month in this case.

**The Department's Continued Efforts to Adapt FOIA Processing to Pandemic Conditions**

4. The Weetman Declaration described the Department's efforts to adapt FOIA processing to pandemic conditions. At the time of that declaration, the Department's Washington, D.C. offices were in Phase One of its three-phase approach for the resumption of normal operations. Accordingly, the Department was continuing to maximize telework.

Twenty-six of the Department's 47 Re-Employed Annuitants ("REA")[1] assigned to process FOIA litigation cases were teleworking and five REAs had returned to their Department workstations, all on a part-time basis. In addition, 3 of the Department's 21 FOIA litigation analysts had returned to their Department workstations. That is, only approximately 12% of IPS' FOIA litigation processing personnel had returned to their Department workstations on a part-time basis.

5. Since that time, the Department's Washington, D.C. offices have moved to Phase Two. Specifically, Department's Washington, D.C. offices entered this phase on July 27, 2020. Under Phase Two, Department components are no longer required to maximize telework, but are encouraged to continue maximizing telework and extending telework flexibilities.

6. In Phase Two, the majority of the Department's FOIA staff continues to telework. At the time of this declaration, approximately 29 of the Department's 47 REAs assigned to process FOIA litigation cases are teleworking. Twelve of the Department's 47 REAs have returned to their Department workstations, all on a part-time basis (some of this number may be performing work remotely, as well). Not all REAs have resumed work because they cannot be compelled to telework. In addition, 3 of the Department's 21 FOIA litigation analysts have returned to regular work at their Department workstations on at least a part-time basis.[2] That is, only approximately 20% of State's FOIA litigation processing personnel have returned to their Department workstations on a regular part-time basis. Moreover, staff working remotely

---

[1] IPS currently employs retired Foreign Service Officers (Re-Employed Annuitants or "REAs") as reviewers to leverage their knowledge of the Department, including their subject matter expertise and experience handling classified information. The Department also employs three retired Foreign Service Officers as contractors to conduct FOIA review. However, contractors are not permitted to make final release decisions on documents. Therefore, they are unable to complete a full review of documents under the FOIA.

[2] At this time, a few analysts, including the analyst assigned to this case, have returned on-site on an intermittent basis but have not returned on a regular full- or part-time basis.

occasionally encounter technical difficulties or other disturbances that slow processing. IPS is currently working to fill three open positions and to hire for new contract positions. IPS is also exploring other options for how to increase staffing but cannot raise its Fiscal Year 2021 hiring numbers prior to having its FY 2021 budgetary allocation.

7. As described in the Weetman Declaration, the Department has devoted substantial resources over the last several months to adapting its FOIA program due in large part to the significant and unprecedented constraints imposed by COVID-19. These efforts have enabled remote FOIA processing in cases such as this one that are located in the Department's new document review system, FOIAXpress. These efforts have also allowed a limited number of personnel to return to the office. This on-site work has permitted the resumption of some processing of cases in the Department's legacy review system (FREEDOMS), which is exclusively available on a classified network and cannot be accessed remotely, as well as cases involving classified records in FOIAXpress.

8. However, a number of FOIA cases that are being processed in FREEDOMS2 and for which the assigned personnel have not returned to the office have been unable to advance since the Department adjusted operations to mitigate the threat of the pandemic. With the continuation of the pandemic's impact and uncertainty over its duration, IPS, as part of its ongoing efforts to adapt, is exploring putting in place a plan to facilitate the processing of these cases. Such a plan will likely involve transferring unclassified portions of those cases housed in FREEDOMS2 to FOIAXpress system. IPS is currently identifying the necessary resources and seeking the necessary approvals to execute this prospective plan. This process is already resource intensive and IPS expects that it will become more resource intensive as it proceeds. Moreover, when processing is able to continue in cases that are currently stayed or otherwise

paused, IPS's processing obligations will grow beyond those represented in the chart filed with the Department's letter to the Court on September 11, 2020.

9. Beyond IPS's own constraints, IPS is also still contending with the constraints of other Department and Executive Branch components. As described in the Weetman Declaration, many documents that IPS processes in FOIA are documents in which other Department and/or Executive Branch components have equities. Accordingly, the review process for these documents necessitates consultations with other Department and/or Executive Branch components. At this time, the constraints on the Department and on other Executive Branch entities will likely continue to create difficulties in obtaining these necessary clearances from other Department or Executive Branch components in Phase Two and beyond. This is because the other Department and Executive Branch components will likely continue to have pandemic-related restrictions on their day-to-day work and may not be prioritizing FOIA compared to essential operations. Because IPS does not release documents in FOIA until it receives clearances from the internal Department components and external Executive Branch components that have equities in the information in those documents, IPS's processing capacity will remain diminished.

10. The Department cannot currently predict when it will be able to enter Phase Three. Although IPS has not yet finalized its processing plans for Phase Three, it anticipates following the same basic framework as it has during Phases One and Two, albeit with more FOIA personnel returning to part-time onsite operations. Further, a regression to an earlier phase remains a possibility due to the shifting nature of the global COVID-19 pandemic and other considerations relevant to decisions affecting the safety and security of Department personnel and their surrounding communities. IPS will continue to follow Executive Branch

and/or Department guidance issued in response to the ongoing public health situation, and will continue to provide updates about its current and anticipated future FOIA processing capacity.

11. In summary, although the Department has devoted significant resources to adapting its FOIA program to the current reality, FOIA processing is still seriously constrained and will likely remain that way until the U.S. Government returns to full operations.

### State's Ability to Process in this Case

12. In light of State's FOIA burden, its limited resources, and the challenges of adapting its FOIA program to the global pandemic, the maximum commitment State can offer in this case at the present time is to process potentially responsive records at a rate of 200 pages per month. This processing rate will provide documents to the Plaintiff "as soon as practicable," in light of the aforementioned burdens and challenges.[3]

13. Over the past several months, State has made significant progress on this case. In addition to conducting searches, which yielded over 9,000 files,[4] State has thus far conducted a preliminary responsiveness review on over 2,000 of those files.[5] That preliminary responsiveness review decreased the number of documents requiring further processing from

---

[3] The Department denied Plaintiff's request for expedited processing based upon its determination that the information Plaintiff requested was not "urgently needed," as that term is defined in the Department's regulations. *See* 22 C.F.R. §171.11(a)(2).

[4] As reported in the September 11, 2020 letter to the Court, Department components tasked with completing non-email searches returned approximately 940 documents. After going through a preliminary de-duplication, this number increased to approximately 1,500 documents, most likely because the system that de-duplicates documents also disaggregates files (for example, by separating emails from attachments). These records are currently undergoing a preliminary responsiveness review.

[5] Of the other documents, over 5,000 were located in State's supplemental email search, which extended the date range of the initial email search. State initially proposed that no search be done for records created after November 3, 2019, the date a court issued a temporary restraining order against the presidential proclamation that is the subject to the request. It was only after discussions in August with plaintiff to avoid dispute about State's search that IPS determined to run this second search.

over 2,000 emails to approximately 420 emails. Additional review has further reduced this number to approximately 135 documents remaining to be processed.[6] In light of the resources required to perform this preliminary responsiveness review, which entailed review of well over 300 pages (the rate to which the Department aspired), State had limited resources to devote to processing responsive documents for FOIA exemptions for its first production on August 31. Going forward, however, State expects that it can process documents designated for further review following the preliminary responsiveness review at a rate of 200 pages per month. State is in the process of performing the preliminary responsiveness review on the over 7,000 files that have not yet been through such a review.

14. State is not currently able to provide a total page number equivalent for the over 9,000 potentially responsive documents due to the systems State uses to process records for FOIA. A page count is generally not immediately available after records are gathered. Instead, a reliable page count becomes available once potentially responsive records are loaded into FOIAXpress. In the interest of efficiency, State is conducting a preliminary responsiveness review and de-deduplication of documents in this case before they are loaded into FOIAXpress. The 135 documents remaining to be processed in FOIAXpress after the initial set of over 2,000 files was reviewed total approximately 1,200 pages.

15. Plaintiff is seeking an order requiring the Department to "produce" 1,000 pages per month or to "process" 1,500 pages per month. Many of the documents that the Department *processes* in any given month are not *produced* because they are determined to be non-responsive or duplicates of previously processed material or are withheld in full under one of the

---

[6] In its September 11, 2020 letter to the Court, the Department reported that the number of documents remaining to be processed was 135. Upon further review, the Department has determined that the number is 137.

FOIA exemptions. Accordingly, an order to "produce" a certain number of pages is far more burdensome than an order to "process" that same number of pages. In addition, an order requiring the Department to "produce" a certain number of pages would be an outlier: all of the court orders discussed in Ms. Weetman's declaration, and all current court orders applying to the Department of which I am aware, require the Department to *process* a certain number of pages, not to *produce* a certain number of pages. This is likely because it would not make logical sense to require order an agency to *produce* – as opposed to process (or make a final determination on) – a certain number of pages when such pages may not be responsive to Plaintiff's FOIA request, may be duplicates of previously processed material, or may be lawfully exempt under the FOIA.

16. Regardless, however, complying with a court order to either produce 1,000 pages per month or process 1,500 pages per month would not be practicable for the Department. As described in the Weetman Declaration, even before the pandemic, the standard processing rate to which the Department could commit across its cases was 300 pages per month. The Department is involved in over 190 FOIA/Privacy Act cases and has finite resources to process FOIA requests both in and out of litigation. These resources are even more limited than usual because of the current pandemic. Implementing a court order to either produce 1,000 pages per month or process 1,500 pages per month would require the Department to redirect its finite and already thinly stretched resources at the expense of other FOIA cases, most of which were filed before this one and a number of which have seen no advancement since the onset of the pandemic. More concretely, IPS would have to reassign several reviewers from the cases to which they are currently assigned to this case, which would halt or dramatically reduce the Department's ability to process those other cases. Such an order would also jeopardize the Department's ability to comply with court orders in its other FOIA litigation cases. Managing compliance with such an

order would further divert resources from IPS' continuing efforts to adapt its FOIA program to the pandemic, which include working to resume processing in cases that have been stayed or paused since March. In short, there would be no way to comply with such an order in this case without causing significant and long-lasting delays to the Department's processing of other, first-in-time requests.

17. Plaintiff further requests that the Court order the Department to produce a *Vaughn* index explaining its redactions concurrently with the productions in this case. It is not feasible for the Department to meet this demand. First, the personnel responsible for preparing *Vaughn* indexes are also responsible for processing documents for production. Accordingly, preparing the *Vaughn* index would directly detract from the resources available to process documents in this case, negating the Department's ability to commit to process 200 pages per month. Second, redactions are not finalized until the production is made and they may change at any point prior to release to Plaintiff, depending on input from legal and subject matter experts involved in the review process. As such, it would not be practicable for the Department to prepare a *Vaughn* index of final withholdings before those withholdings are determined to be final. To be clear, the Department is amenable to a reasonable discussion about the basis for specific withholdings of interest to plaintiff on an informal basis while processing proceeds, and is also open to a more comprehensive discussion about the basis for its withholdings once processing is complete. But it would not be feasible to produce a concurrent *Vaughn* index with each production.

### VI. Conclusion

18. In sum, the current environment, combined with the Department's FOIA burden and resource constraints, has created new challenges that the Department has aggressively sought to address by using new technology and acquiring additional human resources. Even with these

9

*Documented v. Dep't of State, et al.*
No. 20-cv-1946
Stein Declaration

efforts, however, the Department is simply unable to meet Plaintiff's requested processing rate. The Department is prepared to process 200 pages per month and make its next production on September 30. The Department will keep the Plaintiff and the Court apprised of the status of FOIA operations, and proposes revisiting the 200 page per month rate within 45 days of the Department's transition to Phase Three in order to assess whether the rate can be raised.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of September 2020, Washington, D.C.

_____
Eric. F. Stein